IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


LEAGUE OF WILDERNESS DEFENDERS-
BLUE MOUNTAINS BIODIVERSITY PROJECT,
an Oregon Non-Profit Corporation,

               Plaintiff,                 2:10-CV-1346-BR

v.                                OPINION AND ORDER

KEVIN MARTIN, in his official
capacity as Forest Supervisor
of the Umatilla National Forest,
and UNITED STATES FOREST SERVICE,
a federal agency,

               Defendants,

and

DODGE LOGGING, INC., an Oregon
Corporation,

               Defendant-Intervenor.


SEAN T. MALONE
259 E. 5th Ave., Ste. 200-G
Eugene, OR 97401
(541) 859-0403


1 - OPINION AND ORDER

**RALPH O. BLOEMERS**
Crag Law Center
917 S.W. Oak Street, Ste. 417
Portland, OR 97205
(503) 525-2727

       Attorneys for Plaintiff

**DWIGHT C. HOLTON**
United States Attorney
**STEVE J. O'DELL**
Assistant United States Attorney
1000 S.W. Third Ave., Ste 600
Portland, OR 97204
(503) 727-1000

**ERIC HOLDER**
United States Attorney General
**IGNACIA S. MORENO**
Assistant United States Attorney General
Environmental and Natural Resources Div.
United States Department of Justice
**JOHN P. TUSTIN**
Trial Attorney, Natural Resources Section
Benjamin Franklin Station
P.O. Box 663
(202) 305-3022

       Attorneys for Federal Defendants

**SCOTT W. HORNGREN**
5100 S.W. Macadam, Suite 350
Portland, OR 97239
(503) 222-9505

       Attorney for Defendant-Intervenor

**BROWN, Judge.**

    This matter comes before the Court on Plaintiff League of Wilderness Defenders-Blue Mountains Diversity Project's (LOWD) Motion (#61) for Summary Judgment, the Cross-Motion (#68) for Summary Judgment of Defendants Kevin Martin and the United States

2 - OPINION AND ORDER

Forest Service (collectively referred to as Forest Service), and Defendant-Intervenor Dodge Logging, Inc.'s Cross-Motion (#65) for Summary Judgment.

For the following reasons, the Court **DENIES** LOWD's Motion, **GRANTS** the Forest Service's Motion, and **GRANTS** Dodge Logging's Motion.

## THE PARTIES

LOWD is a nonprofit project of the League of Wilderness Defenders whose goal is to increase awareness of the Blue Mountains ecosystems.  LOWD's activities include monitoring proposed Forest Service timber sales in the Blue Mountains.

Martin is employed by the Forest Service as Forest Supervisor of the Umatilla National Forest (Forest).  Martin oversaw the Forest Service's preparation of an Environmental Assessment (EA) in which the Forest Service evaluated the potential environmental impacts of a Timber Sale under the proposed Wildcat II Fuels Reduction and Vegetation Management Project in the Forest.

Dodge Logging purchased the Timber Sale and expects to use the harvested logs at the Pendleton mill of its affiliate, Blue Mountain Lumber Products, LLC.

## THE COMPLAINT

LOWD alleges the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*; the National Forest Management Act (NFMA), 16 U.S.C. § 1600, et seq.; and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), when the Forest Service authorized logging activities under the Timber Sale.

**I.    NEPA/APA Violations.**

**A.    Count I.**

LOWD alleges the Forest Service should have prepared an Environmental Impact Statement (EIS) rather than an EA before deciding whether logging activities under the Timber Sale would significantly impact the Forest.  LOWD alleges the Timber Sale will significantly impact its environment, and, according to LOWD, the Forest Service's July 12, 2010, Decision Notice (DN) and Finding of No Significant Impact (FONSI) was arbitrary and capricious under the APA.

**B.    Counts II-V.**

LOWD alleges the Forest Service violated NEPA and the APA because the EA inadequately addressed the Timber Sale's impact on climate (Count II); the issue of roadless and wilderness areas in the Forest (Count III); scientific opinion supporting or opposing the Timber Sale (Count IV); and direct and indirect cumulative effects of the Timber Sale on the environment (Count V).

## II.  __NFMA Violation__

### A.  Count VI.

LOWD alleges the Timber Sale is inconsistent with the Umatilla National Forest Plan because it does not "provide for the viability" of the black-backed woodpecker.

### __STANDARDS OF REVIEW__

## I.  __APA__.

A federal agency's decision may be set aside under the APA if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2)(A). The court, however, may not substitute its judgment for that of the agency as to the wisdom or prudence of the agency's action. *River Runners for Wilderness v. Martin*, 1064, 1070 (9th Cir. 2010).

Review under the APA requires the court to determine whether an agency's decision is "founded on a rational connection between the facts found and the choices made" and whether the agency "has committed a clear error of judgment." *Id.* The agency's action "need only be a reasonable, not the best or most reasonable, decision." *Id.*

The court's review of the agency's action should be "searching and careful," but "narrow," and the court should not

substitute its judgment for that of the agency. *Ctr for Biological Diversity v. Kempthorne,* 588 F.3d 701, 707 (9th Cir. 2009). "[D]eference to an agency's technical expertise and experience is especially warranted when 'reviewing the agency's technical analysis and judgment, based on an evaluation of complex scientific data with the agency's technical expertise." *Id.* (internal citation omitted).

Agency action should be overturned when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair,* 629 F.3d 1070, 1076 (9th Cir. 2010).

## II. **NEPA**

"NEPA is a procedural statute that does not 'mandate particular results but simply provides the necessary process to insure that federal agencies take a hard look at the environmental consequences of their actions.'" *High Sierra Hikers Ass'n v. Blackwell,* 390 F.3d 630, 639-40 (9th Cir. 2004)(internal citation omitted). To comply with NEPA, federal agencies must prepare an environmental impact statement (EIS) for all "major

Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

A federal agency initially "may prepare an Environmental Assessment (EA) to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS." *High Sierra Hikers Ass'n,* 390 F.3d at 630, 639-40.  An EA is "a concise public document" that:

> (1) Briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact;
>
> (2) Aid[s] an agency's compliance with [NEPA] when no environmental impact statement is necessary;
>
> (3) Facilitate[s] preparation of [an EIS] when one is necessary.

40 C.F.R. § 1508.9(a)(1-3).

"An EA must include 'brief discussions' of the need for the [federal action], of reasonable alternatives, and of the anticipated environmental impacts." *Hapner v. Tidwell,* 621 F.3d 1239, 1244 (9th Cir. 2010).  *See also* 40 C.F.R. § 1508.9(b).  An agency must then prepare an EIS "if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Cal. Trout v. F.E.R.C.,* 572 F.3d 1003, 1016 (9th Cir. 2009).

An EA need not meet all the requirements of an EIS, but "it must be 'sufficient to establish the reasonableness of th[e]

decision' not to prepare an EIS." *Ctr. for Biological Diversity v. Nat'l Hwy Traffic Safety Admin.,* 538 F.3d 1172, 1215 (9th Cir. 2008)(internal citations omitted).

**III. NFMA.**

The Forest Service manages the Forest in accordance with NFMA "to safeguard the continued viability of wildlife in the Forest." *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 961 (9th Cir. 2002). Under NFMA, the Forest Service must "develop [forest plans] for each forest that it manages." *Id.* (citing 16 U.S.C. § 1604(a)). The forest plan must provide for multiple uses of the forest, including "recreation, range, timber, wildlife and fish, and wilderness." *Id.* (citing 16 U.S.C. § 1604(e)(1)). The forest plan also "must comply with substantive requirements of [NFMA] designed to ensure continued diversity of plant and animal communities and the continued viability of wildlife in the forest," including the management of "wildlife habitat" to "maintain viable populations of existing native and desired non-native vertebrate species in the planning area." *Id.* (citing 16 U.S.C. § 1604(g)(3)(B) and 36 C.F.R. § 219.19 (1999)). "[T]o maintain viable populations of wildlife, 'habitat must be provided to support, at least, a minimum number of reproductive individuals and . . . must be well distributed so that those individuals can interact with others in the planning area." *Id.*

## BACKGROUND

On February 28, 2011, the parties filed a Joint Statement of Material Facts (#60) in which they agreed to certain general and specific facts relevant to the issues in this case.  The Court repeats the facts relevant to its analysis.

In July 2010 after completing an EA addressing the environmental impacts of the Timber Sale, Martin, as Forest Supervisor acting on behalf of the Forest Service, made a FONSI and signed the DN permitting the Timber Sale to proceed.  The Forest contains 1.5 million acres, and 1.4 million acres is national forest land.  The Timber Sale area covers 25,450 acres with cold, moist upland forest in the northeast and dry upland forest in the southwest area.  Historic conditions in the Timber Sale area (such as stand density and structure, species composition, and the fire-regime condition class (FRCC)), have been altered because of fire suppression, insects, disease, and past forest-management practices.  FRCC assessments determine how similar a "landscape's fire regime is to its natural or historic state."  *See* About Fire Regime Condition Class: http//frames.nbii.gov.

In the EA the Forest Service describes the "Purpose and Need" for the Timber Sale as follows:

> [R]educe stand densities, develop specific
> stand structures, alter species composition,
> and reduce fuel loadings in order to reduce

> conditions favorable to insect and disease
> outbreaks and wildfire damage.  An additional
> purpose and need is to provide production and
> sustained yield of wood fiber and insofar as
> possible meet production levels consistent with
> various resource objectives, standards and guide-
> lines, and cost efficiency . . . while providing
> jobs to area residents.

EA at 1-6 and 1-7.

In its DN, the Forest Service authorized the Timber Sale to
proceed without the need for an EIS based on the Forest Service's
finding that the "actions proposed" as part of the Timber Sale
"will not have a significant effect on the quality of the human
environment considering the context and intensity of impacts,"
and, therefore, "an [EIS] will not be prepared."  The Forest
Service identified the following project activities as being
within the scope of the Timber Sale:  commercial thinning of
1,963 acres; mechanical-fuels treatment on 2,058 acres;
noncommercial thinning on 2,764 acres; aspen-stand treatment on
53 acres; construction of 2.2 miles of temporary roads;
decommissioning 2.4 miles of existing roads; opening 23 miles of
previously-closed roads; and maintenance work on 44 miles of open
roads.  DN at 3.  In its EA the Forest Service addresses the
impact of the Timber Sale on climate change, on roadless areas
within the Forest, on forest vegetation, and on the black-backed
woodpecker's environment.

The overarching issue addressed in LOWD's challenge to the Forest Service's EA is LOWD's contention that the Timber Sale will have a significant environmental impact on the Forest.  As a consequence, LOWD contends the Forest Service should have prepared a more comprehensive EIS rather than the EA before allowing the Timber Sale to proceed.  The additional issues raised by LOWD are whether the Forest Service's EA adequately addresses the impact of the Timber Sale on the climate (Count II) and roadless and wilderness areas within the Forest (Count III); scientific opinion supporting or opposing the Timber Sale (Count IV); and the direct and indirect cumulative effects of the Timber Sale on the environment.

## DISCUSSION

### Count I:  NEPA - Failure to Prepare an EIS.

#### A.  Standards.

It is unreasonable for the Forest Service to fail to prepare an EIS if "substantial questions exist" whether a proposed action "may have a significant effect on the environment." *N.R.D.C. v. Winter,* 502 F.3d 859, 867 (9th Cir. 2007).  The Forest Service must provide convincing reasons as to why the proposed Timber Sale will not have a significant impact on the environment. *Ctr. for Biological Diversity v. Nat. Highway Traffic Safety Comm'n,* 538 F.3d 1172, 1220 (9th Cir. 2008).  "The statement of reasons

11 - OPINION AND ORDER

is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Native Ecosystems Council v. Tidwell,* 599 F.3d 926, 937 (9th Cir. 2010).

"A proposed action's significance" (*e.g.,* its "proximity to . . . *ecologically critical areas*") is a factor that must be considered when determining the "intensity" of any environmental impact.  40 C.F.R. § 1508.27(b)(3)(emphasis added).  "The degree to which the possible effects on the human environment *are highly uncertain or involve unique or unknown risks*" is another factor to be considered when determining the intensity of any environmental impact.  40 C.F.R. § 1508.27(b)(5)(emphasis added).

**B.  Logging in "Roadless Expanses."**

LOWD contends the proposed Timber Sale is significant because it allows logging in "uninventoried roadless areas" in the project area that are contiguous with or adjacent to inventoried roadless areas outside of the project area.  LOWD asserts these inventoried and uninventoried roadless areas in combination constitute a "roadless expanse" of approximately 34,500 acres.

In *Smith v. U.S. Forest Service,* 33 F.3d 1072, 1078-79 (9th Cir. 1994), the court held the Forest Service violated NEPA when it did not consider the effect of a timber sale on a 5,000-acre roadless area that was partially inventoried and released

for nonwilderness use.  The court coined the term "roadless

expanse" to describe "a contiguous area comprised of an

uninventoried roadless area and an inventoried roadless area."

*Id.* at 1078.  The court described the significance of the timber

sale on the area's "roadless character" as follows:

> [T]he decision to harvest timber on a
> previously undeveloped tract of land is "an
> irreversible and irretrievable decision"
> which could have "serious environmental
> consequences."  That the land has been
> released by Congress for nonwilderness use
> does not excuse the agency from complying
> with its NEPA obligations when implementing a
> land-use program.

33 F.3d at 1078 (internal citation omitted).  The court also

stated, however, that "an EIS may not be *per se* required" for a

timber sale "proposed on inventoried land."  The court left to

the agency "the decision of how best to comply with NEPA and its

implementing regulations."  *Id.* at 1079.

  *In Lands Council v. Martin,* 529 F.3d 1219 (9th Cir. 2008),

the court held the Forest Service's decision to allow a salvage

logging project in a roadless area of more than 5,000 acres that

contained both inventoried and uninventoried roadless areas and

formed a "roadless expanse" as described in *Smith* was significant

for two reasons:

> First, roadless areas have certain attributes
> that must be analyzed.  Those attributes,
> such as water resources, soils, wildlife
> habitat, and recreational opportunities,

possess independent environmental
significance.  Second, roadless areas are
significant because of their *potential for
designation as wilderness areas* under the
Wilderness Act of 1964.

*Id.* at 1230 (emphasis added).

The court also held even if the roadless expanse was less

than 5,000 acres, any proposed logging would be significant if

the area was designated as potential wilderness and was "of

sufficient size as to make practicable its preservation and use

in an unimpaired condition."  16 U.S.C. § 1131(c).

The term "significantly" is defined in NEPA as follows:

Significantly [] requires considerations of
both context and intensity:

(a) Context.  This means that the
significance of an action must be
analyzed in several contexts such as
society as a whole (human, national),
the affected region, the affected
interests, and the locality.  Signifi-
cance varies with the setting of the
proposed action.  For instance, in the
case of a site-specific action,
significance would usually depend upon
the effects in the locale rather than in
the world as a whole.  Both short- and
long-term effects are relevant.

(b) Intensity.  This refers to the
severity of impact.  Responsible
officials must bear in mind that more
than one agency may make decisions about
partial aspects of a major action.  The
following should be considered in
evaluating intensity:

* * *

14 - OPINION AND ORDER

> (3) Unique characteristics of the
> geographic area such as proximity to
> . . . *ecologically critical areas*.

40 C.F.R. § 1508.27(a)(3)(emphasis added).

LOWD contends the Forest Service did not adequately assess the environmental impacts of the Timber Sale on the inventoried and the uninventoried roadless areas as required by *Martin* and *Smith*. In addition, LOWD maintains the Timber Sale is a significant project because it would be undertaken in an "ecologically critical area" that has substantial "roadless expanses." Thus, LOWD contends the environmental impacts of the project should be more thoroughly analyzed in an EIS.

To support its contention, LOWD relies on maps of the Timber Sale project area that purport to identify two substantial roadless expanses that do not show any evidence of past logging and, therefore, are "undeveloped." LOWD contends the Ninth Circuit's holding in *Smith* requires the Forest Service under these circumstances to prepare an EIS before allowing the Timber Sale to proceed. "[T]he decision to harvest timber on a previously undeveloped tract of land is an 'irreversible and irretrievable decision' which could have serious environmental consequences." *Smith,* 33 F.3d at 1078. LOWD further contends the Forest Service attempted to minimize the extent, and thereby the significance, of the roadless expanses by inappropriately

subdividing the two into 178 "polygons," some of which were as small as one acre.

The Forest Service disagrees.  Its position is summarized in the DN as follows:

> There will be no significant effects on
> unique characteristics of the area, because
> there are no wilderness . . . or inventoried
> road areas within the project area boundary.

DN at 17.  *See* Joint Statement of Material Fact 77.  The Forest Service does not use the term "roadless expanses" to describe inventoried and uninventoried roadless areas within or contiguous to the Timber Sale project area.  Instead it refers to "undeveloped lands" within the project area that were addressed in the EA.  The Forest Service asserts it "rigorously analyzed undeveloped lands" in a manner consistent with the holdings in *Smith* and *Martin* and in light of the potential designation of the undeveloped lands as wilderness areas.  The Forest Service also asserts LOWD's objection to the Forest Service's analysis is based solely on the semantical difference in the terminology used by the parties; *i.e.*, LOWD's "roadless expanses" versus the Forest Service's "undeveloped lands."

The Forest Service contends it has complied with *Smith* and *Martin* by specifically analyzing the impact of the Timber Sale on wilderness areas, on inventoried roadless areas that had previously been mapped by the Forest Service, on potential

wilderness areas, and on other miscellaneous areas that are
roadless and did not have any previous history of timber harvest.
*See* EA at 3-228 to 3-248.

The Forest Service also points out that LOWD failed to
disclose the criteria it actually used to determine that the land
in question was roadless.  The Forest Service believes LOWD's
estimate of the extent of roadless expanses in the Timber Sale
project area is based on a misplaced reliance on maps that do not
meet Forest Service criteria for determining potential wilderness
areas within that area.  In any event, the Forest Service
contends even if LOWD used appropriate criteria to determine
whether a particular area of land was roadless, the Forest
Service's experts are entitled to deference when they reach a
different conclusion based on the same information.  *See Marsh v.
Or. Natural Res. Council,* 490 U.S. 360, 377 (1989).

Finally, the Forest Service asserts other areas of the
Forest that LOWD argues are eligible for designation as potential
wilderness areas are ineligible because those areas show evidence
of previous harvesting activities such as skids, trails, and
stumps.

Dodge Logging supports the Forest Service's position and
further asserts its proposed logging activities constitute a
"modest," insignificant "6 million board foot thinning project."
Moreover, Dodge Logging argues even if some logging were to take

place in a potential wilderness area, there is not any *per se*
requirement that an EIS rather than an EA would be required.
*See Smith,* 33 F.3d at 1072.

On this record the Court agrees the Forest Service is
entitled to deference and, therefore, the Court defers to the
Forest Service's technical expertise and its scientists.
Accordingly, the Court adopts the Forest Service's conclusion
that the impact of the proposed Timber Sale on roadless expanses
in the Forest would not be significant and would not
substantially affect the quality of the human environment.  *See
Found. for N. Am. Wild Sheep,* 681 F.2d 1172, 1178 (9th Cir.
1982).

**C.  Effects on Carbon Sequestration/Climate Change.**

LOWD asserts the Forest Service improperly assumes in the EA
that the Timber Sale would reduce the likelihood of naturally
occurring wildfires, thereby decreasing carbon emissions and
causing little or no impact on the climate.

LOWD also contends the Forest Service contradicted itself
regarding the impact of the Timber Sale on climate change by
asserting in the DN that the effects of forest thinning are
"not uncertain" and, at the same time, commenting that "carbon
sequestration and its relation to climate change are not covered
in the EA because of the scientific uncertainty of this issue."
Based on this alleged contradiction, LOWD contends the Forest

Service did not take the requisite "hard look" at this issue.

Finally, LOWD asserts the Forest Service ignored the "Mitchell" study and other scientific studies available to it. LOWD contends these studies support the proposition that the proposed thinning in a forest east of the Cascades would result in greater carbon-emissions loss than would occur from a wildfire.

The Forest Service, in turn, states in the DN that "the climatic effects of a small project such as [the] timber sale are unquantifiable and unnoticeable on a global scale" and "are not significant for the purposes of NEPA." *See Hapner v. Tidwell,* 621 F.3d 1239, 1245 (9th Cir. 2010):

> [T]he Deputy Chief for the National Forest System has issued a guidance document directing the Service to incorporate climate change analysis into its evaluations of projects. That guidance document suggests, for example, that a qualitative discussion of climate change would be necessary in an EA for a proposal to underburn 30,000 acres of ponderosa pine stands. It states, however, that proposals require no discussion if they are of a minor scale [so] that the direct effects would be meaningless. The Project involves a relatively small amount of land and it will thin rather than clear cut trees. Further, we note that the Service addressed comments regarding climate change in its December 2007 notice of final decision. *We therefore conclude that the EA adequately considered the Project's impact on global warming in proportion to its significance*.

Emphasis added.

Dodge Logging joins in the Forest Service's argument and asserts the studies relied on by LOWD to support its position regarding the effect of thinning on climate change do not directly challenge the Timber Sale, and, therefore, the Forest Service did not commit reversible error in not specifically addressing that issue. *See Lands Council v. McNair,* 537 F.3d 981, 1002 (9th Cir. 2008).

On this record the Court concludes the Forest Service adequately addressed the impact of the proposed Timber Sale on carbon sequestration and climate change.

**D.  Controversial Nature of the Timber Sale.**

LOWD contends the Forest Service should have prepared an EIS rather than an EA because the type of subalpine forest thinning proposed here is controversial.  In support of its proposition, LOWD relies on the Declaration of Dr. Richard Waring, an ecosystem scientist with expertise in forestry who opines thinning in subalpine forests is controversial and misguided because it creates unnatural conditions in the forest.

The Forest Service, in turn, contends an actual controversy does not exist because the proposed Timber Sale is in an area that includes mostly cold, upland forest rather than subalpine forest, which is found in only 7% of the project area.  The Forest Service also argues the fact that experts may disagree as

to a project's impact on the environment is not a basis in and of

itself to require preparation of an EIS rather than an EA:

> [T]here [is not any] merit to the contention
> that an EIS must be prepared whenever
> qualified experts disagree, as Greenpeace
> contends.  If this type of disagreement were
> all that was necessary to mandate an EIS, the
> environmental assessment process would be
> meaningless.  An agency's careful evaluation
> of the impact of its proposed action, its
> collection and review of evidence, and its
> reasoned conclusions as to what the data
> reveals would be for naught if by simply
> filing suit and supplying an affidavit by a
> hired expert, predicated upon the same facts
> relied upon by the agency but reaching a
> different conclusion, a litigant could create
> a controversy necessitating an EIS.

*Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir.

1992).  *See also LOWD v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.

1998)(A "controversial" issue for purposes of a NEPA analysis is

one in which there is "a substantial dispute [about] the size,

nature, or effect of a Major Federal Action rather than the

existence of opposition to a use.").

The Court concludes Dr. Waring's opinion regarding the

efficacy and controversial nature of forest-thinning practices

in subalpine forests is not germane here because the thinning

only minimally involves subalpine forest.

**E.  Cumulative Effects of the Timber Sale on the
     Black-Backed Woodpecker.**

LOWD contends the Forest Service should have evaluated the

Timber Sale in an EIS because it would significantly impact

habitat relied on by the black-backed woodpecker.  LOWD asserts
the Forest Service "largely ignore[d]" that threat in its EA and
instead relied on "alleged wildfires outside the project area" to
justify a conclusion that the cumulative effects to that species
would not be significant.

Accordingly, LOWD asserts the Forest Service avoided the
main issue, which is the black-backed woodpecker's need for
habitat that would be affected by high-intensity fires.

The black-backed woodpecker is a management-indicator
species (MIS); *i.e.,* a species whose presence, absence, or
relative well-being in a given environment is indicative of the
environment as a whole.  The black-backed woodpecker relies on
habitat that has a history of high-intensity fires.  According to
LOWD, if the Timber Sale proceeds, there will be a "reduction of
fire intensity and frequency" in the Timber Sale area of the
Forest that could possibly threaten the black-backed woodpecker.

The Forest Service asserts it analyzed snag habitat and
densities relied on by the black-backed woodpecker, but it was
not required to analyze the cumulative impacts of the project as
to "every single one of the thousands of species present in" the
Forest.  Moreover, the forest habitat for the black-backed
woodpecker is not restricted to burned-over stands even if it is
their preferred habitat but also includes old forest stages of
subalpine forest, montane forest, lower-montane forest, and

riparian woodlands.  In any event, high-intensity wildfires may still occur in the black-backed woodpecker's preferred habitat.

Accordingly, the Forest Service asserts it took the required "hard look" in the EA as to potential impacts of the Timber Sale on the black-backed woodpecker.

The Court concludes on this record that the Forest Service adequately analyzed in the EA the impacts of the Timber Sale on the black-backed woodpecker.

## II. **Counts II-V - Specific NEPA Violations.**

The Court's rulings as to LOWD's NEPA challenge in Count I is also applicable to Counts II-V.  Thus, for all of the above reasons, the Court concludes on this record that the EA prepared by the Forest Service satisfies NEPA's requirements and adequately addresses the impact of the Timber Sale as to (1) climate (Count II), (2) roadless and wilderness areas within the Forest (Count III), (3) scientific opinions supporting or opposing the Timber Sale (Count IV), and (4) the direct and indirect cumulative effects of the Timber Sale on the environment (Count V).

## II. **Count VI - NFMA Violation.**

LOWD alleges the proposed Timber Sale would be inconsistent with the Umatilla National Forest Plan because the project "fails to provide for the viability" of the black-backed woodpecker. Specifically, LOWD contends the Forest Service cannot ensure the

23 - OPINION AND ORDER

viability of the black-backed woodpecker because the project is intended to prevent stand loss from wildfires whereas the black-backed woodpecker's preferred habitat includes moderate and high-intensity burned forest areas.

Under NFMA the Forest Service must provide for "diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B), "based on the suitability and capability of the specific land area." *Ecology Ctr. v. Cataneda,* 574 F.3d 652, 657 (9th Cir. 2009).

LOWD alleges the proposed Timber Sale does not comply with the Umatilla Forest Plan because it does not ensure viable populations of the black-backed woodpecker will be maintained in light of the fact that the woodpecker's preferred habitat is burned-over stands or, in other words, the remnants of high-intensity wildfires. Accordingly, the failure to account for the loss of habitat that would result from the Forest Service's fire-suppression activities is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

The Forest Service acknowledges even though the black-backed woodpecker is not specifically listed as an MIS in the Forest Plan, it is a primary cavity excavator and is considered an MIS. Nevertheless, the Forest Service asserts it adequately addressed in the EA the specific habitat needs for the black-backed woodpecker; *i.e.,* snags (partly standing partly or completely dead trees).

24 - OPINION AND ORDER

As noted, the black-backed woodpecker's habitat also includes old forest stages of subalpine forest, montane forest, lower-montane forest, and riparian woodlands in addition to burned stands.  Moreover, high-intensity wildfires may still occur in the black-backed woodpecker's preferred habitat in the Forest.  Thus, even though the woodpecker's preferred habitat is burned-over stands, its habitat also includes old forest stages of subalpine forest, montane forest, lower-montane forest, and riparian woodlands.  In any event, high-intensity wildfires may still occur in the black-backed woodpecker's preferred habitat.  Thus, the Forest Service asserts the proposed Timber Sale does not violate the NFMA.

Dodge Logging contends its logging activities will not involve widespread logging following a forest fire.  While burned-over stands exist in the project area, only three units are planned for logging where there are such stands and are located in an area where the fire had little effect.

On this record, and for the reasons set forth above, the Court concludes the proposed Timber Sale is consistent with the Umatilla Forest Plan; complies with the substantive requirements of the NFMA, 16 U.S.C. § 1604(g)(3)(B); and adequately protects the continued viability of the black-backed woodpecker.  *See Idaho Sporting Cong., Inc.,* 305 F.3d at 962.

25 - OPINION AND ORDER

**CONCLUSION**

For these reasons, the Court **DENIES** Plaintiff LOWD's Motion (#61) for Summary Judgment, **GRANTS** Defendant Forest Service's Cross-Motion (#68) for Summary Judgment, and **GRANTS** Defendant-Intervenor Dodge Logging's Cross-Motion (#65) for Summary Judgment.

IT IS SO ORDERED.

DATED this 23rd day of June, 2011.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

26 - OPINION AND ORDER